Eugene O'Brien, Appellee, v. Chicago, Rock Island & Pacific Railway Company, Appellant.

RAILROADS: Accidents at Crossings—Absence of Flagman, Gates, Etc. —Effect. The failure of a railway company to maintain flagmen, gates, or warning devices at crossings does not constitute negligence, in the absence of proof that the crossing is unusually dangerous and hazardous. Evidence held insufficient to so show.

Headnote 1: 33 Cyc. pp. 945, 1089.

Headnote 1: 16 A. L. R. 1273; 22 R. C. L. 1008.

*Appeal from Palo Alto District Court.*—D. F. Coyle, Judge.

March 21, 1925.

Opinion on Rehearing July 1, 1927.

Action for damages for personal injury received as a result of a collision between an engine of the defendant's and an automobile in which plaintiff was riding. From a verdict of $9,000 in favor of the plaintiff defendant appeals.—*Reversed.*

*J. G. Gamble, R. L. Read,* and *Soper & Soper,* for appellant.

*E. A.* and *W. H. Morling,* for appellee.

ALBERT, J.—A rehearing was granted in this case. The original opinion is found in 202 N. W. 778. Said opinion is withdrawn, and this opinion substituted in place thereof.

Lincoln Street is one of the principal streets in the city of Estherville, and is paved. It extends approximately in an easterly and westerly direction. It is used very much during the summer season, being one of the main arteries leading to the lakes in Dickinson County. Sometime in August, 1920, the plaintiff, O'Brien, with three companions, who lived at some point east of Estherville, took a Ford automobile, owned by one Kane, to make a trip to the lakes. In going there, they traversed this street, and crossed the railroad tracks in controversy, where the accident occurred, at some time during the afternoon. They returned from the lakes about midnight, or a little later. At the time of the accident, one Pierce was driving the car. Kane, the owner, was sitting in the front seat with him, to his right, and Hand and the plaintiff were in the rear seat, plaintiff being on the right side.

They approached this railroad crossing from the west, about 1:30 o'clock A. M. on August 7th, at a speed found by the jury to be 22 miles an hour. For practical purposes, the railroad tracks in controversy, running in a northerly and southerly direction, cross Lincoln Street at approximately right angles. At the point under consideration there are six tracks. West of the freight house, which stands south of Lincoln Street, are three tracks. The main line is east of the freight house. From the center of the main line to the nearest of the three tracks west of the freight house is 100 feet. East of the main line is another track, called the "depot track," and east of the last track and south of Lincoln Street is the passenger station. East of the passenger station is another track. In other words, as one approaches this *locus in quo* from the west, he will first cross what is called the "elevator track," then "House Track" No. 2, and then "House Track" No. 1, which lies immediately west of the freight house.

As the automobile was passing east, they were struck, at a point in the center of Lincoln Street where it intersects with the main-line track, by a "double-header" freight train, going

in a northerly direction. As the main-line track was approached, the view from the automobile, looking southward, was partially obstructed. At a point 100 feet west of where the car was struck, one in the car could see an object on the main line 131 feet from where the collision occurred. At a point 70 feet from the point of collision, an object was observable 300 feet from the point of collision. At a point 50 feet from the point of collision, the view to the south down the track was 779 feet, and at a point 25 feet from the point of collision, the view to the south was unobstructed for half a mile or more.

But two questions of negligence on the part of the defendant were submitted to the jury:

First. The defendant failed to maintain at the crossing in question any gates or flagman or any warning device to warn travelers on the highway of the approaching train.

Second. The defendant failed to ring the bell on the engine as a warning, as the train approached the crossing.

The jury, in answer to a special interrogatory, found that the statutory requirement as to the ringing of the bell had been complied with. It also found, in answer to a special interrogatory, that the speed of the train at the time of the collision was 15 miles an hour. The jury having found in favor of the defendants as to the ringing of the bell, that question is eliminated from our consideration, at the present.

The only question left is the question of whether or not there should have been gates, a flagman, or any warning device at the point in question.

From the evidence in the case it appears that the tracks above described constituted the switch yards of the defendant, and it used a switch engine and crew which went to work at 6 o'clock in the morning and worked until 6 o'clock at night; and, to protect the traveling public during these hours, the defendant kept a flagman at this crossing. From 6 o'clock at night until 6 o'clock in the morning there were no passenger trains, and but one freight train each way. The court submitted to the jury the question of whether or not the defendant should have kept a flagman, gates, or other signaling device on this crossing during the night hours.

We are not unmindful of the rule in this state and other states that, where a railroad crossing is peculiarly and unusually

dangerous or hazardous for the traveling public, it is a question for the jury to say whether or not, under this situation, a flagman or other protective device should be kept at such crossing. We have before, us evidence as to the character of this crossing and its surrounding conditions. We are aided also by numerous photographs, taken of the situation from various angles, and we must say that, under the evidence in this case, the crossing in controversy was not such a crossing as to come within the purview of the aforesaid rule.

The driver of the car testifies that it could be stopped within approximately 25 feet. As above set out, the evidence shows that from 100 feet west of the main-line track where the collision occurred, the driver could see a point 131 feet south from the point of collision, and at a point 50 feet from the track, he could see 779 feet down the track. With this evidence before us, together with other evidence giving a general description of the surroundings of this crossing, we do not, as a matter of law, deem it to be such a peculiarly unusually dangerous or hazardous crossing as comes within this rule. The description and view of this crossing, as we get it from the photographs and the witnesses' testimony, indicate that it is no more dangerous or hazardous than the ordinary railway crossing through any of the towns in this state. The court should not have submitted this ground of negligence to the jury; and, in the light of the verdict rendered and the special finding, its submission was, without question, prejudicial.

Because of the prejudicial error in submitting the question of whether or not the defendant company should have maintained gates, flagman, or any other warning device at the crossing in question, the case is reversed.—*Reversed.*

EVANS, C. J., and FAVILLE, DE GRAFF, VERMILION, and KINDIG, JJ., concur.

MORLING, J., takes no part.