Ted R. Russell, appellant, v. Chicago, Rock Island & Pacific Railroad Company et al., appellees.

No. 49253.

(Reported in 86 N.W.2d 843)

DECEMBER 17, 1957.

REHEARING DENIED FEBRUARY 14, 1958.

James B. Smith, of Perry, for plaintiff-appellant.

A. B. Howland and B. A. Webster, Jr., both of Des Moines, and Roscoe Jones, of Atlantic, for defendants-appellees.

THOMPSON, J.—About 8:45 p.m. on January 11, 1955, the plaintiff was a passenger in an automobile owned and driven by Calvin Petersen, which collided with a car of a standing freight train of the defendant Chicago, Rock Island & Pacific

Railroad Company at a grade crossing on Olive Street in Atlantic, Iowa. The plaintiff sustained injuries for which he claims damages. Petersen and the conductor and engineer of the train were made defendants in the action, but were removed from it by directed verdicts and no complaint is made of these rulings. The issues here are solely between the plaintiff and the railroad company.

The Olive Street crossing at which the accident occurred is on the outskirts of Atlantic. Petersen's car approached the crossing from the south, upon what is described as "black top" surfacing. As a witness for the plaintiff, Petersen estimated the speed of his car as it left the last intersection before reaching the crossing at 25 to 30 miles per hour. His brakes and lights were in good working order. The crossing is protected by the statutory cross buck warning signs; but in view of the fact that both Petersen and the plaintiff knew of the presence of the crossing we consider these to be of little importance in the case. The crossarms did no more than advise them of what they already knew—that is, that they were approaching a railroad track. There were no lights at the crossing; the nearest street light was at the street intersection south of the railroad crossing, about 300 feet away. About 600 feet to the east is the plant of the power company, which is lighted by floodlights. There is substantial evidence that neither the street light at the intersection immediately south nor the floodlights on the utility buildings, approximately two blocks away, lighted the crossing. The night was dark, without moon or stars. There is some evidence of a light mist.

As Olive Street leaves the intersection south of the crossing it slopes downward until it reaches a point variously given as 80 to 150 feet south of the crossing. Until this point is reached by a car going north on Olive its lights are deflected down so that the crossing is not visible; but from there on they shine upon the crossing. Petersen testified that as he left the street intersection to the south he looked to the east for trains; then to the west, where his view was somewhat obscured until he had passed the end of the down slope; then he looked to the east again, and after he passed the end of the slope he looked again to the west. He was then confronted with the boxcar of the

standing train immediately in front of him, and although he applied his brakes, he was unable to stop and a collision resulted. He says: "Well, the boxcar was sort of a blackish as the headlights shined on it, it blended right into the road at first until I glimpsed down further and it shined on the wheels, that's the first I realized there was a train in front of us." As to the lights on the utility plant, he testified he saw no reflection of them on the train; "The light on top of the light plant * * * would shine right over the top of the train."

Petersen at the time had lived for several months on Olive Street about two blocks from the crossing in question. The crossing was equipped with a bell signaling device, of the type which rings as a train is approaching and while it is upon the crossing. Petersen and another witness, Mrs. Paul Pellett, whose car approached the crossing from the north immediately after the collision, both testified they did not hear the bell ringing at this time. Other facts will be referred to later in this opinion.

I. The errors relied upon for reversal are three: 1, that the court was in error in granting the motion for judgment notwithstanding verdict and the motion for a new trial; 2, that the court erred in holding that the evidence did not make a jury question of the existence of an unusually hazardous crossing; and 3, that the court was in error in holding that the jury argument of plaintiff's counsel was improper and, we assume, granting a new trial therefor.

We shall first consider that part of assigned Error No. 1 which complains of the grant of the motion for judgment notwithstanding. Assigned Error No. 2 goes to the same point, and our discussion will be addressed to it also. As a preliminary, if the court was right in ordering judgment notwithstanding verdict, of course the ruling on the motion for new trial is moot.

■■ In considering the ruling sustaining the motion for judgment notwithstanding, we apply the familiar principle that the evidence is to be taken in its most favorable aspect to the plaintiff. Citation of authority on this point is hardly necessary, but see Lawson v. Fordyce, 234 Iowa 632, 635, 12 N.W.2d 301, 303. The most important question in the case is whether there was a jury issue as to the unusually hazardous conditions at and surrounding the Olive Street railroad crossing where the col-

lision occurred. The plaintiff relies upon Lindquist v. Des Moines Union Ry. Co., 239 Iowa 356, 30 N.W.2d 120. We held there that the statutory requirements are minimum rather than maximum standards for protection of railway crossings, and if an unusually hazardous condition exists or is created by some act of the company, a jury question as to the latter's negligence is created. Also discussed is the question of proximate cause, and a like holding—that is, that an issue for the jury may be engendered—is reached.

The Lindquist case was factually much like the case at bar. The suit was brought by a passenger in a car which collided at night with a car of a standing freight train at a highway intersection. We there reversed a directed verdict for the defendant, and in so doing overruled some of our previous decisions. In the case at bar the matter was first submitted to the jury; but after a verdict for the plaintiff the court concluded that there were sufficient factual differences from the Lindquist case so that the latter was not controlling, and sustained the motion for judgment. The defendant here endeavors to point out what it believes to be the material differences in the facts and so to sustain the trial court's analysis. There are some elements in the Lindquist case not present here; but we think there is a sufficient resemblance so that the relationship may not be entirely disowned.

II. We shall follow the distinctions which the defendant endeavors to make. It is pointed out that in the Lindquist case the highway was a paved state road, while here it was a city residential street, and no showing is made of the volume of traffic. The amount of traffic does not seem important upon the question of a hazardous condition except that, if such a condition does exist, more travelers upon the highway will be endangered. If it is there, it is just as dangerous to those who do use the road as though their numbers were legion. This element might have some bearing upon the necessity for gates, or a flagman, as we discussed in Chicago, Rock Island & Pacific R. Co. v. Long, 243 Iowa 514, 51 N.W.2d 135; but it does not excuse the railway company from using reasonable means to warn and protect.

The defendant further points out that there were a number of lights of filling stations and spotlights on gas storage tanks in the vicinity of the Lindquist accident which shone in the eyes of approaching motorists and shadowed the crossing. Obviously this situation did not exist in the case at bar. There were no lights; there is substantial evidence the crossing was not merely shadowed, but entirely dark. As to defendant's claim that the lights on the utility plant "silhouetted" the train, we must consider the substantial evidence most favorable to plaintiff, and we have pointed out that Petersen said these lights shone over the top of the train.

■ There was evidence offered and rejected in the Lindquist case of two fatal accidents at the crossing there involved in the five years last past, and we held this should have been admitted. There is no such evidence here. But on the positive side the offered testimony of the witness Morrow, in Lindquist, which we there held was wrongfully rejected by the court, was in substance identical with the admitted testimony of Paul Pellett in the instant case. Pellett testified that he had been using the Olive Street crossing for about 30 years; that for several years last past he had made an average of three trips each day over this crossing; and that he had often crossed it when it was dark and under conditions similar to those existing on the night of January 11, 1955. He said that at such times it was difficult to see a boxcar standing on the crossing, and he had "come awful close" to hitting a train there; on how many occasions is not clear. In the Lindquist case we held such evidence admissible to show the hazardous nature of the crossing. The trial court here in its opinion granting the motion for judgment notwithstanding verdict expressed its conclusion that this evidence should not have been admitted, attempting to distinguish it from the Morrow testimony above referred to. We are unable to see any substantial difference. Both the facts and reasoning of this court in discussing the Morrow testimony are in point here. The testimony was properly admitted, and it supports the submission of the issue of an unusually hazardous crossing for the jury's determination. Whether, standing alone, this evidence would have been sufficient to require such submission we need not determine. There is other important evidence.

670

III. The defendant properly points out that the evidence of a custom of flagging the crossing when trains were stopped there at night, by an employee with a lighted lantern, which was important in Lindquist, was lacking here. This evidence was admitted to show a recognition by the railroad company of the hazardous condition. We find in the record here such a recognition, although in a different form. The Olive Street crossing was protected by a warning bell, which rang while trains were approaching and while they were upon the crossing. This is a rather common form of warning device. Petersen testified that they could hear the bell ringing as trains passed over or stood upon the crossing, at his home, some two blocks away. Other witnesses also testified concerning this signal. But Petersen and Mrs. Paul Pellett, whose car reached the crossing from the north immediately after the collision, while Petersen's car was still jammed against the side of the train, say they did not hear the bell ring. There is testimony of another witness who was at the crossing some five or six hours later that the bell did not then ring when trains passed. There was contrary evidence from the defendant; but the testimony was sufficient to generate a jury question as to whether the bell warning was in fact working as the Petersen car approached the crossing. For a discussion of what evidence is necessary to require a jury determination on this question see Strom v. Des Moines & Central Iowa Ry. Co., 248 Iowa 1052, 1066–1068, 82 N.W.2d 781, 789, 790. The situation here is well within the rule laid down in the Strom case.

We recognize that the trial court did not submit the plaintiff's specification of negligence 3(b), based upon the failure of the bell warning signal to be in operation at the time of the accident; and that the plaintiff took no exception to such failure and does not urge it here. We think this specification should have been submitted. But the situation nevertheless has an important bearing upon the question of a hazardous crossing. The fact that the railroad company equipped the crossing with this warning device shows its recognition that without it the crossing was hazardous; just as did the use of flagmen in the Lindquist case. There is something more: at least for those

who knew of the warning bell, failure to keep it in operating order added greatly to the danger at the crossing.

The point is well stated in Langston v. Chicago & North Western Ry. Co., 398 Ill. 248, 254, 75 N.E.2d 363, 366: "It has likewise been held that when railroad crossing signals are maintained by a company, even though the law does not require them to be installed, the public has a right to rely upon the railroad company to keep the same in an efficient working condition [citing authorities]." On the same page of the opinion the Illinois Supreme Court quoted with approval from Niemi v. Sprague, 288 Ill. App. 372, 386, 8 N.E.2d 707, 713: " 'It must not be lost sight of that the purpose of this signal was not only to warn traffic of the approach of trains, but its nonoperation was to assure the traveler that it was safe to cross.' "

Even if specification of negligence 3(b) had not been pleaded, the plaintiff would have had the right to show, if he could, the nonoperation of the bell signal. The signal was a recognition by the company of the normal hazards of the crossing, and a marked addition to those hazards when it was not operating. It must be kept in mind that we are not here deciding the crossing was hazardous; only that the question was for the jury. Nor are we holding that the crossing in question should be protected by gates, or by permanent flashing signals, or other type of permanent construction. That question is not in the case. Our holding is confined to the decision that the facts shown in evidence made an issue for the jury upon the negligence of the defendant in creating a hazardous situation and failing to protect travelers from it. If the signal was not operating—another question for the jury to decide—the defendant's employees in charge of the train must have known it, or in the exercise of reasonable care should have known; and so a duty to protect traffic upon the highway by some other proper warning might be found to exist.

We have examined the authorities cited by the defendant, but do not find them in point. In some, as in Lemke v. Chicago, Rock Island & Pacific Railroad Co., 8 Cir., 195 F.2d 989, the issue was contributory negligence, which is not involved here; in many others the question involved was one of fact, resulting in a holding that no unusual hazard was shown. Some of the

672

Federal cases cited turn upon the rules of law followed in other states. None of them is highly persuasive in the factual situation we have in the instant case.

IV. We turn then to consideration of the alternative ruling of the trial court in granting the motion for a new trial. One of the grounds in defendant's motion was that "the court erred in overruling defendant's objection to the final argument of plaintiff's counsel to the jury which were [sic] in effect 'how much money would you jurors take to go through life injured as this man is', said argument being unfair, improper, not a matter for consideration by the jury in assessing the damages and an appeal to passion and prejudice." No shorthand report of the jury arguments was made, but the motion for new trial sets out the alleged statement as shown above, and in a resistance filed plaintiff's counsel does not deny that it was made, but justifies by saying "* * * plaintiff's counsel's argument was proper as jurors are permitted to use their own experiences in light of the evidence in considering and evaluating the evidence as to damages sustained by plaintiff * * *." The trial court in its memo granting the motion for new trial stated the argument of plaintiff's counsel substantially as defendant has done, and noted that objections to this line of argument were twice made by defendant and overruled by the court. The court then concluded that the argument was improper and the objections should have been sustained. The new trial was granted upon this and one other ground.

Direct appeals to jurors to place themselves in the situation of one of the parties, to allow such damages as they would wish if in the same position, or to consider what they would be willing to accept in compensation for similar injuries are condemned by the courts. 53 Am. Jur., Trial, section 496, page 401; 88 C. J. S., Trial, section 191, page 376; Murphy v. Cordle, 303 Ky. 229, 197 S.W.2d 242, 243; Wells v. Ann Arbor Ry. Co., 184 Mich. 1, 150 N.W. 340, Ann. Cas. 1917A 1093; Morrison v. Carpenter, 179 Mich. 207, 146 N.W. 106, Ann. Cas. 1915D 319; Kahn v. Green, Tex. Civ. App., 234 S.W.2d 131, 133; F. W. Woolworth Co. v. Wilson, 5 Cir., 74 F.2d 439, 442, 98 A. L. R. 681. It is evident that the argument of counsel in

the case at bar was improper and the objections of defendant's counsel should have been granted. The court was at least within its fair discretion in granting a new trial on this ground.

Other matters argued are such as are not likely to arise upon another trial and we do not consider them.

The order granting judgment notwithstanding verdict is reversed; the order sustaining the motion for new trial is affirmed, and the cause remanded for further proceedings.— Reversed in part, affirmed in part and remanded.

All JUSTICES concur.